**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------x
In re:                                              :     Chapter 7
                                                    :
Gordon Henry Hastings and                           :     Case No.: 04-50332 (AHWS)
Lynn Daly Hastings,                                 :
        Debtors.                                    :
---------------------------------------------------------x
The Cadle Company,                                  :
        Plaintiff,                                  :
                                                    :
v.                                                  :     Adv. Proc. No.: 04-5048
                                                    :
Gordon Henry Hastings and                           :
Lynn Daly Hastings,                                 :
        Defendants.                                 :
---------------------------------------------------------x

APPEARANCES:

Richard M. Levy, Esq.                         Attorney for Plaintiff The Cadle
Kroll, McNamara, Evans & Delehanty LLP        Company
29 S. Main Street
West Hartford, CT 06107

Louis J. Testa, Esq.                          Attorney for Defendants Gordon Henry
Neubert, Pepe & Monteith, P.C.                Hastings and Lynn Daly Hastings
195 Church Street, 13th Floor
P.O. Box 1940
New Haven, CT 06510

**MEMORANDUM AND ORDER ON COMPLAINT**
**OBJECTING TO DISCHARGE UNDER 11 U. S. C. § 727**

Alan H. W. Shiff, United States Bankruptcy Judge:

      The plaintiff, The Cadle Company, seeks a determination that the defendants,

Gordon Henry Hastings and Lynn Daly Hastings, be denied a discharge under

bankruptcy code §§ 727(a)(2)(B), (a)(3), (a)(4)(A), and (a)(5).

## BACKGROUND

There is no dispute as to the following.[1] The defendants commenced this chapter 7 case on March 12, 2004 ("Petition Date").[2] They are married and reside in Cos Cob, Connecticut. On the Petition Date, Mr. Hastings was employed as the president of Broadcasters' Foundation, Inc. ("BFI"), and Mrs. Hastings worked for a temporary employment agency.

On or about July 12, 1991, People's Bank obtained a judgment against the defendants in the amount of $108,261.49, pursuant to an action brought in the Supreme Court of the State of New York. The judgment related to an unsecured personal loan Mr. Hastings incurred in connection with certain failed business interests in Upstate New York.[3] Tr. Vol. III at 91-92. People's Bank sold and assigned the judgment to the plaintiff on or about September 17, 1997. On December 12, 2004, the plaintiff commenced this adversary proceeding.

## DISCUSSION

Bankruptcy has traditionally sought to balance the rights of creditors holding allowed claims with the public interest in providing an economic fresh start to honest debtors in the

---

[1] The parties filed a Joint Stipulation of Facts, dated January 7, 2009, from which the facts in the "Background" section are taken. Further, the parties agreed that Mr. Hastings' testimony and all of the exhibits applied equally to Mrs. Hastings. *See* Tr. Vol. IV 142-144.

[2] The defendants signed their schedules and statements on February 14, 2004, almost a month prior to the Petition Date. *See* Ex. A. On April 6, 2004, they amended Schedule F and the mailing matrix. *Id.*

[3] Mr. Hastings was the president and sole shareholder of Hastings Broadcasting Corporation ("HBC"), which, *inter alia*, owned and operated three radio stations in Upstate New York. *Id.* at ¶¶ 7-10.

form of a discharge of dischargeable debts. *See* §§ 727(a) and (b). To be eligible for such a discharge, a chapter 7 debtor must surrender all property for distribution to creditors, except that which is defined as exempt. But it is not uncommon in chapter 7 cases for creditors to receive no distribution or less than the benefit of their original bargain. In those cases, colloquially referred to as "no-asset" cases, the design and purpose of a bankruptcy petition, its associated forms and schedules, the meeting of creditors where the debtor testifies under oath, and other disclosure mechanisms, are especially important as they provide a basis for testing the debtor's eligibility for a discharge.

The plaintiff, an unsecured creditor, challenges the defendants' honesty in a four-count complaint which relies on several subsections of § 727(a). The plaintiff has the burden of proving the essential elements for each of these counts by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *see also Adams v. Bostick (In re Bostick)*, 400 B.R. 348, 356 (D. Conn. 2009). In determining whether the plaintiff has satisfied that test, its complaint "must be construed strictly against [it] and liberally in favor of the [defendants]". *In re Bostick*, 400 B.R. at 355 (quoting *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d. Cir. 1996)).

I.  §§ 727(a)(2)(B) and (a)(4)(A) – The Counts Requiring Intent

The Second and Third Counts of the plaintiff's complaint specify §§ 727(a)(4)(A) and (a)(2)(B), respectively.[4]

Section 727(a)(4)(A) provides in relevant part:

---

[4] The counts of the complaint inexplicably follow a nonprogressive sequence.

> The court shall grant the debtor a discharge, unless–. . . (4) the debtor knowingly and fraudulently, in or in connection with the case– . . . (A) made a false oath or account . . .

11 U.S.C. § 727(a)(4)(A) (West 2009).

In order to deny discharge under this subsection, the plaintiff must establish that: (1) the defendants made the statement under oath; (2) the statement was false; (3) the defendants knew the statement was false; (4) the statement was made with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Republic Credit Corp. v. Boyer (In re Boyer)*, 367 B.R. 34, 44-45 (Bankr. D. Conn. 2007).

> Section 727(a)(2)(B) provides in relevant part:
>
> The court shall grant the debtor a discharge, unless–. . . (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed- . . . (B) property of the estate, after the date of the filing of the petition . . .

11 U.S.C. § 727(a)(2)(B) (West 2009).

To prevail under this provision, the plaintiff must prove that: (1) the defendants transferred or concealed; (2) property of the estate; (3) with the intent to hinder, delay or defraud a creditor; (4) after the filing of the petition. *Bostick,* 400 B.R. at 356.

These paragraphs share a common predicate in that they require the plaintiff to establish that the defendants acted with fraudulent intent, i.e., that the defendants committed the alleged false oath, omission, or concealment for the specific purpose of perpetrating a fraud or due to a reckless indifference to the truth. *See, e.g., Boyer*, 367 B.R. at 45 (citing *D.A.N. Joint Venture, L.P. v. Cacioli (In re Cacioli I)*, 285 B.R. 778, 784

(Bankr. D. Conn. 2002), *aff'd*, 463 F.3d 229 (2d Cir.2006)). The issue then is not whether there were inaccuracies in the papers the defendants filed with or in connection with their bankruptcy petition, e.g., schedules and the statement of financial affairs ("SOFA"), or in their various testimony.[5] The defendants have admitted as much. *See, e.g.,* Stip. at ¶¶ 11, 27-28, and 43-49. Rather, the issue is whether the defendants intended to deceive or mislead creditors. Because clear, unambiguous evidence of a debtor's intent does not usually exist, the requisite intent may be discerned by assessing relevant circumstantial evidence filtered by the credibility of the debtor as a witness. *See, e.g.*, In re Boyer, 367 B.R. at 45 ("A determination concerning fraudulent intent depends *largely upon* an assessment of the credibility and demeanor of the debtor.") (emphasis added) (citation and quotation omitted)).

In an effort to establish the required intent, the plaintiff has offered evidence with respect to the defendants' initial failure to disclose: (A) their interests in a Fleet checking account, a Wachovia checking account, and a Merrill Lynch CMA account; (B) the closing of a Wachovia savings account; (C) their ownership of a fur coat, books, pictures, and furniture;[6] (D) the true cash value of their life insurance policies; (E) certain repayments to Mr. Hastings' employer; (F) the leasing of two storage facilities; and (G) the true value of

---

[5] Such testimony consists primarily of the initial § 341 meeting of creditors which was held on April 6, 2004. Tr. Vol. III at 138. At Mr. Hastings' request, the meeting was reconvened on May 21, 2004. Stip. at ¶ 56. The plaintiff conducted Rule 2004 examinations of Mr. Hastings and Mrs. Hastings on June 23, 2004, and September 10, 2004, respectively. *Id.* at ¶¶ 52-53. On October 20, 2006, the plaintiff deposed Mrs. Hastings, and on November 21, 2006, it deposed Mr. Hastings. *Id.* at ¶¶ 54-55.

[6] The court deems abandoned any other items of personal property which the plaintiff identified in its complaint and questioned defendants about at trial but which it has not discussed in its post-trial briefs, e.g., a Browning 20-gauge shotgun and two horses. *See* Tr. Vol. IV at 179 (court's instructions to the parties regarding post-trial briefing, including "what evidence you claim supports your position").

their personal property.

*(A).  Existence of Financial Accounts*

In paragraph 2 of Schedule B - Personal Property, the defendants stated that they did not have any checking, savings, or other financial accounts. Stip. at ¶ 23; Ex. A, Sch. B at ¶ 2. However, the defendants have stipulated that on the Petition Date they had an interest in accounts with Fleet, Wachovia, and Merrill Lynch. Stip. at ¶ 22. The defendants have credibly explained that they believed they disclosed the existence of these accounts by virtue of the $500 "cash on hand" figure they provided in paragraph 1 of Schedule B, as that was the aggregate of monies held in those accounts. Tr. Vol. II at 133-34; Tr. IV at 148-49, and 156-57. The credibility of their explanation is supported by the case trustee's trial testimony that it is not uncommon for debtors to account for money held in a bank account by listing it as cash on hand. Tr. Vol. IV at 137-38. The plaintiff urges the court to reject this explanation. It points to the fact that, on February 17, 2004, just three days after signing their schedules, the defendants specifically identified the accounts at issue in a form they submitted to the Internal Revenue Service ("IRS"). *See* Ex. V at ¶¶ 11-12, 14.

The information reported in the IRS form does not conflict with the defendants' explanation. The cash on hand figure in Schedule B is consistent with the relevant aggregate amount the defendants provided in the IRS form, i.e., the defendants disclosed $500 cash on hand in Schedule B and a total of $494.48 in the IRS form. *Compare* Ex. A, Sch. B at ¶ 1, *with* Ex. V at ¶¶ 11-12 and 14.

Also, a comparison of the IRS form with Schedule B reveals differences between the two forms that reasonably would have caused the defendants to be more specific in

the former but not the latter. The IRS form asks for specific information concerning bank routing numbers, account numbers, and account balances. By contrast, paragraph 2 of Schedule B is more vague.

### B. *Closing of Wachovia Savings Account*

In paragraph 11 of the SOFA, the defendants indicated that they had not closed any financial accounts held in their names in the one-year period prior to the Petition Date. Ex. A, SOFA at ¶ 11. However, the record indicates that on February 20, 2004, i.e., less than one month before the Petition Date, but after they signed the SOFA, Mrs. Hastings closed a Wachovia savings account which had a balance of approximately $100. Tr. Vol. II at 148-49; Tr. Vol. IV at 162-63. Mrs. Hastings explained that she and Mr. Hastings did not amend the SOFA to reflect the closing of the account since "there was [only] $100 in the account and [she] didn't think it would impact anything . . . [because] the money was for [her] daughter . . ." Tr. Vol. IV at 162. The court finds the explanation credible and at most indicates the defendants' failure to amend their SOFA. But, without more, it does not establish that the omission was made with fraudulent intent. *See In re Chalasani*, 92 F.3d at 1310 (reiterating that § 727 imposes an extreme penalty and therefore "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the [debtor]'"); *see also In re Lewis*, Adv. No. 07-00016, 2007 WL 4591960, at *21 (Bankr. D. Mont. Dec. 28, 2007) (finding that the defendants' failure to amend their schedules and SOFA was not sufficient to deny their discharge on the basis of § 727(a)(4)(A) where the plaintiffs had not satisfied their burden of showing that the false statements and omissions were made knowingly and fraudulently).

### C.    *Books, Other Art Objects, Antiques*

In paragraph 5 of Schedule B, the defendants stated "NONE" for personal property consisting of, *inter alia*, books, other art objects, or antiques. Ex. A, Sch. B at ¶ 5. However, the defendants have stipulated that on the Petition Date they stored approximately 30 cases of books at a moving and storage facility in Torrington, Connecticut.[7] Stip. at ¶ 44. At trial, the defendants also acknowledged owning two oil paintings and various furniture. They explained that they believed they had accounted for these items in paragraph 4 of Schedule B, wherein they provided an aggregate figure of $15,000 for household goods and furnishings. The defendants also testified that although they were unsure of the value of any specific item, they did not believe that the books, the paintings, and the furniture had a total value exceeding $15,000. Tr. Vol. IV at 28, 89-92 (books); Tr. Vol. III at 56-57, and Tr. Vol. IV at 151-52, 153 (furniture); Tr. Vol. IV at 150-51 (paintings). Again, the trustee testified that it is not uncommon for debtors to schedule property in one category even when such property might be considered as includable in another category, e.g., art objects versus household goods. Tr. Vol. IV at 137-38. The plaintiff did not successfully rebut any of this testimony.[8, 9]

---

[7] The defendants concede that they did not list the lease on this storage space (or the lease on another storage space located in Port Chester, New York) in Schedule G of their bankruptcy petition. Defs.' Br. at 12-13. However, the defendants explain that all the personal items stored at those facilities have since been disclosed. *Id.*

[8] Significantly, the plaintiff did not proffer an appraisal of the books, paintings or furniture (the latter of which it has insisted on referring to as "antiques" without establishing that fact).

[9] Mr. Hastings' testimony at the Rule 2004 examination, *see* note 5, *supra*, does not contradict his trial testimony regarding the books. *Compare* Pl's Br. at 4, *with* Tr. Vol. IV at 28, 90-91.

### D.     Furs and Jewelry

In a similar vein, the plaintiff argued that the defendants did not adequately disclose their ownership of a fur coat and two Rolex watches. Instead, they provided only a cumulative figure of $2,500. Stip. at 46; Ex. A, Sch. B at ¶ 7. With respect to the fur coat, the defendants have stipulated that they owned the coat on the Petition Date. Stip. at ¶ 47. At trial, the defendants testified that they had accounted for the coat under either the $1,000 figure in paragraph 6 of Schedule B, or the $2,500 figure in paragraph 7 of Schedule B. Tr. Vol. III at 45-47; Tr. Vol. IV at 71-72, 164. They explained that because the coat was over 20 years old, they did not believe it had any significant market value. *Id.* Nothing in the record refutes this explanation.[10] Moreover, the defendants' explanation is supported by the case trustee's testimony that "used fur coats . . . bring little, if any, value to the estate". Tr. Vol. IV at 110.

With respect to the Rolex watches, the defendants testified that those were also included in the $2,500 figure in paragraph 7 of Schedule B. Tr. Vol. III at 60-61. The plaintiff contends this explanation cannot be accepted because the watches are scheduled and valued in the defendants' renter's insurance policy for an aggregate amount of more than $22,000. Pl.'s Br. at 8; Ex. K at 2. However, Mr. Hastings explained that the insurance policy reflects the replacement value of the watches, not their current market value. Tr. Vol. III at 62-63. The plaintiff has not rebutted this explanation with evidence

---

[10] This is true despite the plaintiff's assertion that the defendants did not mention the fur coat at the continued § 341 meeting when asked what items were included in the $2,500 figure they provided under paragraph 7 of Schedule B. Pl.'s Br. at 5. *See also* Ex. 8 at 21. The court views this alleged omission as inapposite. It is just as likely that the defendants did not mention the fur coat in response to that question because they believed that they had accounted for it under paragraph 6 of Schedule B. *See also* Tr. Vol. IV at 71-72 (Mr. Hastings testifying that neither he nor Mrs. Hastings intended "to keep from [the U.S. Trustee] that [Mrs. Hastings] owned a 27 year old fur coat").

establishing, e.g., that the market value of the watches was higher, and that the defendants knew it to be higher, than what they indicated in paragraph 7 of Schedule B.[11]  *See* Ex. A, Sch. B.

### E.    *Mrs. Hastings' Pre-Petition Income*

As further proof of the defendants' alleged fraudulent intent, the plaintiff points to the defendants having incorrectly indicated in paragraph 1 of the SOFA that Mrs. Hastings had no income in 2003. Pl.'s Br. at 6.  The record reflects that, in 2003, Mrs. Hastings had gross annual income of $14,069. Ex. M.  At trial, Mrs. Hastings explained that the omission was unintentional and that the 2002 gross annual income figure of $29,535 the defendants provided in the SOFA included income she earned for both 2002 and 2003.  Tr. Vol. IV at 158-59.  Mrs. Hastings' explanation is credible and is further supported by her federal tax returns for 2002 and 2003 (wherein she reported all of her 2003 income with her 2002 income).[12]  Ex. H at 1 (line 21).

### F.    *Prepaid Management Fees*

In paragraph 3(b) of the SOFA, the defendants indicated that they had not repaid any loans in the one year prior to the Petition Date.  Ex. A, SOFA at ¶ 3(b).  However, the record reflects that during that period, from approximately July 2003 to January 2004, Mr.

---

[11] For similar reasons, the court rejects the plaintiff's argument that the defendants have concealed the true value of other personal property. Pl.'s Br. at 8.  The plaintiff relies on the defendants' renters' insurance policy that included contents coverage for their residence of $350,000. *Id.*  The defendants have explained the figure reflects replacement value for the contents.  Tr. Vol. III at 61-62.

[12] The defendants have stipulated that Mrs. Hastings was employed with a temporary placement agency as of January 2004. Stip. at ¶ 48.  The plaintiff references this fact in its brief but does not explain why it is inconsistent with the defendants' answer in paragraph 1 of the SOFA, i.e., despite being employed with the temporary employment agency in 2004, nothing in the record indicates that Mrs. Hastings actually had income in 2004 as of the Petition Date.

Hastings made repayments to his employer, BFI, totaling more than $150,000 with respect to prepaid management fees he received from BFI for the period 2001 to 2003.[13] Tr. Vol. II at 98, and 100-05. Mr. Hastings explained at trial that he did not list these repayments in the SOFA because he did not believe they related to a loan, but were simply repayments of advances on his future salary. Tr. Vol. III at 110-12, 127, and 129-30. Significantly, the defendants listed as creditors the various members of the BFI board of directors who loaned Mr. Hastings the majority of the funds he used to repay BFI on the advances. *See* Ex. A at Sch. F. That disclosure, together with Mr. Hastings' explanation, supports the defendants' assertion that they did not attempt to conceal the repayments. The plaintiff has not meaningfully rebutted any of this.[14]

G.   *Life Insurance Policies*

In paragraph 9 of Schedule B, the defendants indicated that they each held a life insurance policy. Ex. A, Sch. B at ¶ 9. On February 14, 2004, the defendants scheduled Mr. Hastings' insurance policy as having a cash value of $1,000, and Mrs. Hastings'

---

[13] BFI paid Mr. Hastings an annual management fee prior to retaining him as a full-time employee. Tr. Vol. II at 118-19. Mr. Hastings periodically took advances on those fees in order to support his family. *Id.* In 2003, BFI retained a new chairman who required such advances to be "paid up." *Id.* at 98, 105. Mr. Hastings complied with this request by, *inter alia*, borrowing from (and executing promissory notes to) various members of the BFI board of directors, authorizing deductions from his paycheck, writing a personal check, and using his credit card. *Id.* at 102-07. *See also* Exs. P, Q.

[14] For example, in 2003, the defendants filed an amendment to their 2001 federal tax return to recharacterize as loans $70,000 they had reported as income, i.e., the prepaid management fees from BFI now at issue. Tr. Vol. I at 55, 57; Ex. G. The plaintiff urges the court to view this as evidence that the defendants knew the fees constituted loans, but Mr. Hastings credibly testified that the amendment was made under the advice of his accountant and that he had no technical knowledge of the basis for making it. Tr. Vol. I at 61-62. Also, despite the plaintiff's argument to the contrary, Mr. Hastings' testimony at the initial and reconvened § 341 meetings regarding the purpose for taking the prepaid fees, as well as the money he subsequently borrowed from various individuals to repay a portion of those fees, is not evidence of the defendants' alleged fraudulent intent because it is consistent with his explanation that he required the money in order to cover family expenses. *Compare* Pl.'s Reply Br. at 6, *with* Tr. Vol. IV at 118-19.

insurance policy as having a cash value of $1,500. *Id.* However, the record shows that the actual net cash values of the defendants' policies at about the time of the Petition Date were higher: Mr. Hastings' policy had a net cash value of more than $12,000, and the net cash value of Mrs. Hastings' policy was approximately $2,500. Exs. L at ¶ 3, X and Y.

The plaintiff insists that these discrepancies are evidence of the defendants' fraudulent intent because the defendants provided the correct net cash value of Mr. Hastings' policy in the IRS form they signed. Pl.'s Br. at 5-6; Ex. V at ¶ 16. The plaintiff also points to a similar IRS form the defendants completed in 2003 which reflects a significantly higher net cash value for Mr. Hastings' policy. Tr. Vol. III at 34-36; Ex. W. The defendants contend that the inaccuracies relating to their insurance policies in Schedule B are due to unintentional oversight and mathematical error. Tr. Vol. III at 22-23, 145; Tr. Vol. IV at 32-34. The record supports their explanation in several respects.

A comparison of paragraph 9 of Schedule B with the IRS forms reveals the plausibility of the defendants' explanation that they made an unintentional mathematical error in Schedule B, but not in the IRS forms. Paragraph 9 of Schedule B is vague, requiring the defendants to list an interest in any insurance policy, the name of each insurance company, and the surrender or refund value of each policy. In contrast, the IRS forms are more detailed. They required the defendants to list specifically, *inter alia*, the policy number, the current cash value, and the outstanding loan balance for each insurance policy. Exs. V at ¶ 16, W at ¶ 16. The IRS forms also provided an explicit

formula for calculating the net cash value of each policy.[15]  *Id.*

Moreover, the court does not view the contents of the IRS forms as proof of the defendants' financial condition because they contain inaccuracies and omissions.  The 2003 IRS form incorrectly lists Mrs. Hastings as the owner of Mr. Hastings' policy; the 2004 IRS form does not list Mr. Hastings as the owner of his policy; and neither form discloses the existence of Mrs. Hastings' policy.  The import of this is that the defendants were, on more than one occasion, slipshod about the specifics of their insurance policies.[16]  Yet, absent other evidence, that alone does not lead to the conclusion that the inaccuracies in paragraph 9 of Schedule B were made with fraudulent intent.

Accordingly, because the defendants have provided reasoned and credible explanations as to each inference of fraudulent intent raised by the plaintiff, the court finds that the plaintiff has failed to meet its respective burdens under §§ 727(a)(2)(B) and (a)(4)(A).

---

[15] Additionally, the dates on which the defendants signed the respective IRS forms in relation to the date they signed their schedules makes neither IRS form a reliable indicator of the defendants' alleged fraudulent intent.  The 2003 IRS form was completed nearly one year *before* the defendants signed their bankruptcy schedules, and the 2004 IRS form was completed *after* the defendants signed those schedules.  At most the 2004 IRS form is *prima facie* evidence of the defendants' failure to amend, *see, e.g.*, Pl.'s Reply Br. at 3, which, without more, is not sufficient for denying discharge.  *See supra* at 6-7.

[16] Despite the plaintiff's argument to the contrary, *see* Pl.'s Reply Br. at 4, the defendants' slipshodness is not *per se* equivalent to a reckless disregard for the truth.  *See In re Gardner,* 384 B.R. 654, 667 (Bankr. S.D.N.Y. 2008) (reasoning that mere ignorance or carelessness does not constitute reckless disregard for purposes of establishing intent under § 727(a)(4)); *see also In re Sapru*, 127 B.R. 306, 316 (Bankr. E.D.N.Y. 1991) (stating that reckless disregard requires *both* that a debtor was indifferent to the serious nature of the information sought *and* did not expend the necessary attention to detail and accuracy in connection with a bankruptcy filing).  Moreover, nothing in the defendants' testimony at the continued § 341 meeting supports a different inference.  *Compare* Pl.'s Br. at 6 and Pl.'s Reply Br. at 2-3, *with* Ex. 8 at 14-16.

II.  § 727(a)(3) - The Count Regarding Failure to Maintain Records

Count One alleges that the defendants should be denied a discharge because they failed to maintain adequate records of their bank and credit card accounts, Mr. Hastings' life insurance policy, and Mr. Hastings' ownership and disposition of HBC.

Section 727(a)(3) provides in relevant part:

> The court shall grant the debtor a discharge, unless– . . . (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . .

11 U.S.C. § 727(a)(3) (West 2009).

To prevail under that count, the plaintiff must establish that (1) the defendants failed to keep or preserve books and records, and (2) such failure hindered the plaintiff's ability to ascertain the defendants' true financial condition or business transactions. *See D.A.N. Joint Venture, L.P. v. Cacioli (In re Cacioli II)*, 463 F.3d 229, 234-35 (2d Cir. 2006); *Pergament v. DeRise (In re DeRise)*, 394 B.R. 677, 687-88 (Bankr. E.D.N.Y. 2008). If established, the defendants must then justify the absence of such records, which is a question of reasonableness under the particular circumstances. *Id*.

As noted, on or about the time of the Petition Date, the defendants held checking and savings accounts with Wachovia, a Fleet checking account, and a First National Bank of Omaha credit card account. With respect to Wachovia and Fleet, the defendants produced account summaries for the period from December 1998 to March 2004. Exs. J, R, S and U. The plaintiff challenged the adequacy of that production, arguing that without copies of corresponding cancelled checks, check registers, and check stubs, it could not

identify check payees, and therefore could not ascertain the defendants' financial condition. That argument is unavailing.

The defendants countered with the testimony that the checking accounts in question were merely household accounts into which Mr. Hastings deposited his salary and from which household and other personal expenses were then paid. Tr. Vol. II at 125-26, 141; Tr. Vol. III at 67-72. A review of the checking account statements produced by the defendants comports with this explanation in that, for the period in question, check-writing activity remained constant in terms of the volume and dollar amounts of checks.[17] *See* Exs. J, R, S, and U.

Although not a model for emulation, that explanation does not warrant the conclusion sought by the plaintiff, which it attempted to support with cases which involve debtors who used accounts for business or other complex transactions. *Cf. Baker v. Trachman,* 244 F.2d 18, 20 (2d Cir. 1957) (debtor engaged in flooring contract business and "hired labor, billed for certain jobs, and purchased materials"); *In re Underhill*, 82 F.2d 258, 259 (2d Cir. 1936) ("bankrupt had traded extensively in the stock market, buying and selling securities"); *In re Blonder,* 258 B.R. 534, 536 (Bankr. D. Conn. 2001) ("[t]he debtor, both individually and through [wholly-owned] corporate entities . . . engaged in the business of buying, selling, and brokering luxury [goods]"); *In re Levine*, 107 B.R. 781, 783 (Bankr. S.D. Fla. 1989) (debtors engaged in "substantial business transactions"). Moreover, Mr. Hastings testified that he did not keep cancelled checks because he believed he would be

---

[17] A review of the account statements also shows regular and periodic monthly cash withdrawals of amounts usually between $100 to $200 each, averaging approximately $1,000 per month. *See* Exs. J, R, S, and U. The consistency of this activity for the period from December 1998 to March 2004 supports the defendants' explanation, *supra*.

able to obtain them from the banks upon request.[18]  Tr. Vol. II at 136-37.[19]

The plaintiff has not demonstrated an absence of records as to the Wachovia savings accounts.  Contrary to the plaintiff's assertion that the defendants produced few documents pertaining to these accounts, see Pl.'s Br. at 25, the record contains monthly statements from December 1998 through February 2004.  Exs. R, S, and U.  Although the documents do not provide explicit transaction details, i.e., specific deposits and withdrawals, they provide monthly ending balances.  And, a month-to-month comparison of these balances reveals that in the aggregate there was relatively little activity in either savings account.

Finally, the plaintiff's arguments regarding the defendants' failure to maintain adequate records as to Mr. Hastings' insurance policy and his ownership and disposition of HBC are not persuasive.  As previously noted, the record contains copies of annual statements relating to Mr. Hastings' insurance policy for October 2003 and October 2004.  By the plaintiff's own admission, these statements "clearly set forth the cash value, the amount of the surrender charge, the amount of the outstanding loan . . . and the net cash value of [Mr. Hastings'] policy as of those dates."  Ex. L and Pl.'s Br. at 26.  Similarly, the plaintiff recognized that the defendants produced documents relating to their ownership and disposition of HBC.[20]  Ex. C and Pl.'s Br. at 27; see also Exs. 1-4.

---

[18] Despite requests, Mr. Hastings' banks were unable to provide those records.  Tr. Vol. III at 99 and 135-36; see also Tr. Vol. IV at 26.

[19] The court reads Mr. Hastings' explanation as applying to both the Fleet and Wachovia checking accounts.

[20] The plaintiff's objection as to records relating to the insurance policies and the disposition of HBC appears to be based primarily on the timing and manner in which the defendants obtained the records rather than on their absence, i.e., that the defendants did not personally possess such records on the Petition Date and had to obtain them from the relevant third-party entities.  See, e.g., Pl.'s Br. at 26-27.

The defendants have provided reasoned justifications, *supra*, for being unable to produce certain, albeit unnecessary, records. *See Cacioli II*, 463 F.3d at 238 (affirming bankruptcy court's finding of reasonable justification for purposes of § 727(a)(3) based in part on the lower court's positive evaluation of the debtor's testimony). Therefore, the plaintiff cannot prevail on the first count of its complaint.

III.  § 727(a)(5) – The Count Regarding Failure to Explain the Loss or Deficiency of Assets

In the Fourth Count, the plaintiff seeks a denial of the defendants' discharge on the basis that they have not satisfactorily explained the loss or deficiency of assets.

Section 727(a)(5) provides in relevant part:

> The court shall grant the debtor a discharge, unless– . . . (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtors liabilities . . .

11 U.S.C. § 727(a)(5) (West 2009).

In order to obtain the denial of discharge under that subsection, a plaintiff must first establish a loss or deficiency of an identifiable asset, *see In re Cacioli II*, 463 F.3d at 238, and that burden is met by the plaintiff "producing some credible evidence of the requisite loss or deficiency." *In re Cacioli I*, 285 B.R. at 784, *aff'd*, *In re Cacioli II*, 463 F.3d 229. If the plaintiff makes such a showing, the defendant must then explain satisfactorily the loss or deficiency. *See In re Cacioli II*, 463 F.3d at 238. Such an explanation need not be corroborated by documentary proof so long as it is reasonable. *See In re Cacioli II*, 463

---

The plaintiff has not established, however, that this offends § 727(a)(3). *Cf. In re Cacioli II*, 463 F.3d at 238 (finding it reasonable for the debtor to delegate duty of maintaining certain business records to his business partner).

F.3d at 238 ("As long as the [defendants'] explanation is convincing and not rebutted, there is no need for documentary corroboration.").

In this proceeding, the plaintiff claims that it has established the loss or deficiency of assets because the record reflects "significant outflows of money". Pl.'s Reply Br. at 13. The plaintiff claims those "outflows" came from the following identified assets: (1) the defendants' aggregate income of approximately $1.7 million for the years 1999 to 2003; (2) funds in their Merrill Lynch CMA account, which had a balance of as high as $350,000 in January 1999; (3) funds in Mr. Hastings' Merrill Lynch defined benefits account, which had a balance of approximately $408,000 in August 2000; (4) prepaid management fees from BFI, for the period 2001 to 2003, totaling more than $150,000; and (5) the defendants' personal property, which they estimated in their renters' insurance policy as having a value of approximately $350,000 for the period from March 1, 2003, to March 1, 2004. Pl.'s Br. at 16-19; Pl.'s Reply Br. at 12.

In examining whether the plaintiff has met its initial burden, the court notes that certain of the identified assets have been inflated. The $1.7 million income figure is a gross number that clearly must be adjusted for the withholding of taxes and other allowable withholdings. Similarly, the plaintiff quotes transfers from the Merrill Lynch CMA and defined benefits account in pre-tax figures, resulting in double-counting of income.

Further, the court is not convinced that the plaintiff's reference to balances in the Merrill Lynch CMA account and Mr. Hastings' defined benefits account satisfy its § 727(a)(5) *prima facie* burden. The balances quoted by the plaintiff are taken from statements that are dated four and five years prior to the Petition Date. Because those balances reflect, at least in part, the then-prevailing market value of stock held in those

accounts, a comparison of those balances is meaningless without first accounting for market fluctuations.

However, assuming, *arguendo*, that the plaintiff has made the requisite showing, the defendants have satisfactorily explained the alleged loss of assets or deficiency of assets. In essence, having observed the defendants and having assessed the credibility of their testimony, the court concludes that the defendants' explanations are credible. For example, Mr. Hastings explained that the reason there was a diminution in the value of the accounts was because they were invested "100 percent" in equities that fluctuated in value over those years. Tr. Vol. II at 74. The plaintiff did not refute that testimony. Similarly, as Mr. Hastings testified, the discrepancy between the data in the bankruptcy petition and the $350,000 renter's insurance policy, emphasized by the plaintiff, was due to different valuations, i.e., that the renter's insurance policy stated the "replacement value" of property, while the figures provided in the petition reflect the market value of that property. Tr. Vol. III at 62. Again, there was no meaningful rebuttal to that explanation. Finally, the defendants testified that the balance of the assets was used to meet various household expenses. *See, e.g.*, Tr. Vol. II at 118-20, 126; Tr. Vol III at 19, 74-77, 107-09, and 118-19; Tr. Vol. IV at 84-87. There was no effective rebuttal to that testimony.

Accordingly, the Fourth Count is not a basis for denying the defendants' discharge. *See In re Cacioli I*, 285 B.R. at 784 (holding that despite plaintiffs' satisfaction of their initial burden under § 727(a)(5), denial of discharge was not proper because the debtor, through trial testimony alone, had more than satisfactorily explained his financial history and condition).

## CONCLUSION

For the foregoing reasons, the plaintiff has failed to prove, by the preponderance of the evidence, any of the four counts alleged in its complaint. Accordingly, judgment will enter in favor of the defendants, and IT IS SO ORDERED.

Dated this 29th day of September 2009 at Bridgeport, Connecticut.

*Alan H. W. Shiff*
Alan H. W. Shiff
United States Bankruptcy Judge